# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS - FORT WORTH DIVISION

| | | |
|---|---|---|
| **TAMERA BYRNE and GARY DAVIS,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | **Civil Action No.** |
| **LOCKHEED MARTIN CORPORATION,** | § | **4:22-cv-00621** |
| **OFFICE OF PERSONNEL MANAGEMENT, and** | § | |
| **GENERAL SERVICES ADMINISTRATION** | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT

COME NOW, Plaintiffs Tamera Byrne and Gary Davis, Lockheed Martin Corp. employees, herein seeking redress from their employer's deprivation of their fundamental rights while acting in a state capacity without due process of law, and statutory rights under the Americans with Disabilities Act not to be to answer post-employment inquiries.

Summarizing, Plaintiffs are victims of the militant COVID-19 policies adopted by Lockheed to mitigate COVID-19 spread. As essentially a privatized arm of the federal government, Lockheed is obligated to protect the fundamental rights of employees. Those obligations include a guarantee of due process before mandating that Lockheed employees subject themselves to experimental drugs that provide minor benefits, at best, and have substantive side effects.

Additionally, Lockheed is obligated to follow federal law, which disallows post-employment medical inquiries that are unconnected to work-based requirements.

Plaintiffs seek economic damages and declaratory relief.

## CONTENTS

I.   PARTIES ........................................................................................................... 3
    A.   Plaintiffs – Lockheed Martin Employees ("Lockheed Plaintiffs") .............. 3
    B.   Defendants .................................................................................................. 3
II.  JURISDICTION, STANDING, AND VENUE ........................................................ 4
    A.   Subject Matter Jurisdiction ....................................................................... 4
    B.   Personal Jurisdiction .................................................................................. 4
    C.   Standing ...................................................................................................... 9
    D.   Venue .......................................................................................................... 9
    A.   Lockheed Martin ....................................................................................... 10
III. FACTUAL ALLEGATIONS ............................................................................. 13
    B.   Tamera Byrne ........................................................................................... 13
    C.   Gary Davis ................................................................................................ 14
IV.  CAUSE OF ACTION AND CLAIM – 42 U.S.C. § 1983 ..................................... 15
    A.   Authorities ................................................................................................ 15
        1.   Government Actors ................................................................................. 15
        2.   Constitutionally Protected Right to Refuse Medical Treatment ............ 21
        3.   Color of Law .......................................................................................... 27
        4.   Remedies ............................................................................................... 28
    B.   Claim: Lockheed Martin violated 42 U.S.C § 1983. .................................. 28
        1.   Lockheed qualifies as a government actor. ............................................ 28
        2.   Lockheed violated Plaintiffs' constitutionally protected rights. ............. 33
        3.   Lockheed violated Plaintiffs' rights under color of law. ......................... 33
V.   CAUSE OF ACTION AND CLAIM – 42 U.S.C. 12112(D)(4)(A) ........................ 33
    A.   Authorities ................................................................................................ 33
    B.   Claim: Lockheed Martin violated 42 U.S.C. § 12112(d)(4)(A). ................. 34
VI.  REQUEST FOR RELIEF ................................................................................. 35
    A.   DAMAGES ................................................................................................ 35
        1.   Compensatory Damages ........................................................................ 35
        2.   In the alternative – Nominal Damages .................................................. 36
        3.   Attorneys' Fees ...................................................................................... 36
    B.   DECLARATORY JUDGMENT ................................................................. 36
VII. PRAYER ....................................................................................................... 36

## I.  PARTIES

### A.  Plaintiffs – Lockheed Martin Employees ("Lockheed Plaintiffs")

1.      Plaintiff Tamera Byrne is a Texas citizen as a U.S. citizen and permanent Texas resident. She lives in the Northern District of Texas. She may be served through her counsel of record, the undersigned.

2.      Plaintiff Gary Davis is a Texas citizen as a U.S. citizen and permanent Texas resident. He lives in the Northern District of Texas. He may be served through his counsel of record, the undersigned.

### B.  Defendants

3.      Defendant Lockheed Martin Corporation ("Lockheed" or "Lockheed Martin") is a global security and aerospace company headquartered in Bethesda, Maryland. Lockheed Aeronautics is a major unit of Lockheed and is headquartered at Air Force Plant 4 in Fort Worth, Texas. Lockheed Missiles and Fire Control is in Grand Prairie, Texas. Lockheed may be served through its registered agent for service, CSC – Lawyers Incorporating Service Company, at 211 E. 7th Street, Ste. 620, Austin, Texas 78701-3218.

4.      Defendant Office of Personnel Management ("OPM") is a federal agency which may be served through Chad Meacham, U.S. Attorney for the Northern District of Texas, 1100 Commerce, Third Floor, Dallas, Texas 75242.

5.      Defendant General Services Administration ("GSA") is a federal agency which may be served through Chad Meacham, U.S. Attorney for the Northern District of Texas, 1100 Commerce, Third Floor, Dallas, Texas 75242.

## II.  JURISDICTION, STANDING, AND VENUE

### A.  Subject Matter Jurisdiction

6.     This Court exercises subject matter jurisdiction under 28 U.S.C.S. § 1331 because this Court has original jurisdiction concerning questions of the federal Constitution and federal laws.

7.     This Court also exercises subject matter jurisdiction in accordance with 28 U.S.C.S. § 1361, which grants the district court original jurisdiction "of any action to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Lockheed, as agent of the U.S. government due to its federal contracts, owes a duty to Plaintiffs to comply with 21 U.S.C.S. § 360bbb-3 (concerning medical products for use in emergencies), as its provisions are intended to protect them.

8.     This Court has supplemental jurisdiction of state claims based on the relevant facts supporting Plaintiffs federal claims described herein under 28 U.S.C.S. § 1367.

### B.  Personal Jurisdiction

9.     This Court has specific personal jurisdiction over Lockheed because it is present in the forum state. Lockheed is present in Texas through its contacts. Those contacts are sufficient for this Court to exercise jurisdiction because there is an appropriate long-arm statute; that statute authorizes the exercise of jurisdiction, and that exercise is consistent with the Due Process clauses of the federal Constitution.

10.     Fed. R. Civ. P 4(k)(1)(A) allows this Court to use Texas's long-arm statute. The relevant long-arm statute is the Tex. Civ. Prac. & Rem. Code § 17.001, *et seq*. The

---

*Byrne, et al. v. Lockheed Martin Corp., et al.* - Original Complaint

Texas Supreme Court has routinely interpreted this long-arm statute as extending to the full extent that the Due Process Clause of the federal Constitution allows. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010); *see also Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990); *see also U-Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977).

i.   <u>Texas Courts have jurisdiction over parties conducting business in Texas.</u>

11.   Tex. Civ. Prac. & Rem. Code § 17.042 allows a court to exercise personal jurisdiction over a non-resident business when it contracts with a party and performance of the contract in part or whole occurs in Texas. Alternatively, courts may exercise personal jurisdiction when the non-resident business recruits Texas residents, directly or through an intermediary for employment. *Id.*

12.   Lockheed has contracted with many parties inside of Texas as well as hiring Texas citizens both for employment in and outside of Texas. Plaintiffs in this case are examples of business activities meeting Tex. Civ. Prac. & Rem. Code § 17.042.

ii.   <u>This Court's exercise of personal jurisdiction over Lockheed is consistent with the Due Process Clause.</u>

13.   Texas law via the Federal Rules of Civil Procedure authorizes this court to exercise personal jurisdiction if it is consistent with due process. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); *see also Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779-80 (2017).

iii.   <u>Lockheed has sufficient minimum contacts with the forum state.</u>

15.   If a non-resident party is physically present in the forum state when the act giving rise to the suit occurred, this is a sufficient basis for this Court to exercise

personal jurisdiction. *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 619, 110 S. Ct. 2105, 2115 (1990); *see also Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 1122 (2014) (affirming that physical presence of a non-resident party in the forum state is sufficient basis for personal jurisdiction).

16.     If a non-resident party purposefully avails itself of the benefits of the forum state, that availment is a sufficient basis for this Court to exercise personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75; *see also Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024–25 (2021). The defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U. S. 235, 253 (1958). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U. S. 770, 774 (1984). They must show that the defendant deliberately "reached out beyond" its home – by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U. S. 277, 285 (internal quotation marks and alterations omitted).

17.     Lockheed is one of the largest aerospace companies and defense contractors in the world. While its headquarters are in Bethesda, Maryland, it maintains a large workforce in North Texas. Fort Worth hosts Lockheed Aeronautics, where the F-35 is developed and produced. Lockheed Aeronautics is a major unit of Lockheed and is headquartered at Air Force Plant 4 in Fort Worth. This physical presence in Texas qualifies well as a sufficient basis for minimum contacts.

18.     Lockheed further employs more than 30,000 professionals around the world and builds and sustains premier systems, such as the F-35, F-22, F-16, C-130, U-2, among others. The aeronautics unit's F-35 production alone represents more than $3 billion in economic impact to the state of Texas.[1]

19.     Lockheed Missiles and Fire Control is headquartered in Grand Prairie, Texas. Lockheed considers itself an "employer of choice in the Dallas-Fort Worth area" and boasts more than $1 million in annual donations to Fort Worth education initiatives and other charities.[2] Together, it is fair to say that Lockheed has purposefully availed itself of Texas's numerous benefits such that Lockheed has sufficient minimum contacts with Texas to form a basis for jurisdiction.

   iv.   <u>This suit relates to Lockheed's contacts.</u>

20.     Not only does Lockheed have sufficient minimum contacts with Texas to form the basis for personal jurisdiction, but also this suit relates to Lockheed's contacts with Texas, further justifying this Court's exercise of jurisdiction. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1028 (2021).

21.     Lockheed works, markets, and develops its products inside of Texas. As both the Court in *Ford* and *Helicopteros Nacionales De Colombia v. Hall* held, the essence of personal jurisdiction is a strong relationship among the defendant, the forum, and the suit. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1028 (2021); *see also Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 414, 104

---

[1] *Celebrating Innovation*, Lockheed Martin, https://www.lockheedmartin.com/en-us/news/features/2017/celebrating-75-years-of-innovation-in-fort-worth.html (visited May 27, 2022).
[2] *Id.*

S. Ct. 1868, 1872 (1984). Similarly, a strong relationship exists here, supporting this Court's jurisdiction over the parties.

v.   <u>Maintenance of this suit is fair and reasonable.</u>

22.   Finally, maintaining this suit against Lockheed is fair and reasonable. Generally, "[w]hen a corporation purposefully avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is subject to suit there" and it is not unreasonable to subject that corporation to a suit in the forum. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 110 (1987) (internal citations omitted).

23.   In this suit, the factors weigh in favor of this Court exercising personal jurisdiction over the Defendants. With the extent of the business Lockheed does in Texas, it is on notice that it is subject to a suit here. Unlike Asahi in *Asahi Metal Indus.*, Lockheed has several large plants and operational centers in Texas with convenient access to the Court. *Id*. at 114. Further, Lockheed is a domestic corporation with a registered agent in Texas. There is no great burden on Lockheed.

24.   Texas also has an interest in the resolution of this suit due to the citizenship of the Plaintiffs. Unlike parties on appeal in *Asahi Metal Indus.*, the Plaintiffs are citizens of Texas in whom Texas has a high interest in the administration of swift and effective justice. *Id*. at 114–15.

25.   The interstate judicial system has an interest in resolving the dispute because it relates to federal law and employment. Unlike *Asahi Metal Indus.*, this Court would be resolving a dispute between U.S. citizens and a U.S. corporation, resolution that

reflects the inherent to the function of the judiciary to administer justice to U.S. citizens. *Id.* at 115.

26.     Finally, this Court exercising personal jurisdiction is permissible because resolution of this suit would further substantive policies. As this Court is aware, the COVID-19 era has created a slew of new legal controversies over the boundaries between public and private action as well as the extent of legal protection for conscientious objectors. Unlike *Asahi Metal Indus.*, this Court has a vested interest in clarifying the legal rights and protections of specifically U.S. citizens. *Id.* at 115–16. Therefore, maintenance of this suit in this forum is fair and reasonable and this Court can and should exercise personal jurisdiction over the parties.

**C. Standing**

27.     Plaintiffs satisfy the "case-or-controversy" requirement of Article III of the Constitution and have standing to sue because they:

> (1) [have] suffered an "injury in fact" that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;
> (2) the injury is fairly traceable to the challenged action of the defendant; and
> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) (citing *Lujan v. Defs. of Wildlife*, 112 S. Ct. 2130, 2136 (1992)).

**D. Venue**

28.     Venue is proper in this Court pursuant to 28 U.S.C.S. § 1391(b) because substantial events complained of herein occurred in this District and Division.

### E. Lockheed Martin

29.     Lockheed Martin is the largest federal defense contractor in the United States.

Most of Lockheed's business is with the U.S. Department of Defense and U.S. federal

government agencies, as stated on its website.[3] Lockheed employs approximately

114,000 people worldwide and is principally engaged in the research, design,

development, manufacture, integration, and sustainment of advanced technology

systems, products, and services. It has at least two large facilities in Texas, one in

Fort Worth and the other in Grand Prairie.

30.     In response to the spread of COVID-19, Lockheed created a COVID-19

response program to combat the unknown effects of the novel virus. In the fall of 2021,

Lockheed announced that its employees must be "fully vaccinated" per EO 14042;

that is, receive a COVID-19 vaccine followed by a two-week waiting period.

Employees not complying faced termination.[4]

31.     Nearly 98% of the Lockheed U.S. workforce is already vaccinated, according to

a corporate communication. The same communication states that "the most effective

way to control transmission of the Delta and Omicron variants is for us all to commit

to and execute on employee safety controls," and employees should get "vaccinated to

---

[3] *Who We Are*, Lockheed Matin, https://www.lockheedmartin.com/en-us/who-we-are.html (last visited May 27, 2022) ("Customer Base" section of the page).
[4] Plaintiffs reluctantly use the nomenclature of "vaccination" only to avoid the charge of verbal pedantism but are impelled to point out that none of the alleged "vaccines" available are actually vaccines, as they do not prevent spread of the COVID-19 viruses nor result in natural immunity. Additionally, they are not approved by the FDA as vaccines, but are distributed only under an emergency use authorization.

protect those most vulnerable." Exhibit 1, Lockheed Employee Email Concerning Vaccination ("Our Highest Gratitude").

32.     A corporate communication titled "Prioritizing Safety" states in part:

> Employees who have not certified their vaccination status or requested an accommodation will be required to follow specific job safety protocols. Those protocols will be determined by a Job Safety Assessment conducted by Environment, Safety and Health (ESH) and your supervisor, and the Company may consider the viability of a weekly COVID-19 testing routine for which the Company would plan to provide testing materials and reimburse expenses. . . . we will institute job safety protocols for all employees who have not certified as fully vaccinated with proof of vaccination or without an approved accommodation. Those protocols will be determined by a Job Safety Assessment conducted by Environment, Safety and Health (ESH) and your supervisor and may include weekly COVID-19 testing. If you work full-time or require access to a federal government facility, you may still be required to abide by certain actions and/or comply with restrictions as identified by federal government facilities, to include but not limited to, form DD3150 completion, COVID-19 testing requirements, proof of COVID-19 vaccination and/or other enhanced safety measures.

Exhibit 2, Corporate Communication ("Prioritizing Safety"). In conjunction with EO 14042, Lockheed implemented an exemption process allowing exemptions only for religious or medical reasons. It contains no exceptions for conscientious objectors or those who previously contracted COVID-19.

33.     Lockheed required all employees to make one of the following declarations regarding their "vaccination status": (1) I have been fully vaccinated; (2) I have been partially vaccinated; (3) I have not been vaccinated; (4) I wish to request a medical or religious accommodation.

34.     Lockheed has stated that some accommodations may be only temporary in nature. Such accommodations will have mandatory future reviews. Additionally, employees must submit their accommodations annually.

35.     Lockheed's religious exemption process is lengthy, comprising a three-prong process requiring written statements and signatures from multiple individuals, reminiscent of the Spanish Inquisition. First, each employee must obtain written and signed statement of a religious leader describing the history of the employee's religion of choice and supporting the basis of the employee's faith or beliefs which require the employee to abstain from the COVID-19 vaccination requirement. Second, the process requires an employee to obtain a written and signed statement from an additional third-party witness describing how long the employee has belonged to the religious organization and held this belief. Third, employees must provide a certification describing their belief system; noting how long they have observed or practiced their religion; identifying the specific practice, tenet, or observation that prohibits the employee from receiving a COVID-19 vaccine; and, if their religion does not require abstention from all vaccines, identifying the practice, tenet, or observation that prohibits the employee from receiving a COVID-19 vaccine specifically.

36.     Only if Lockheed approves the exemption will it tell the employee what his accommodation consists of. If Lockheed approves the exemption, employees must agree to ongoing reviews of their accommodations. Further, the employee must certify that Lockheed may modify or remove his accommodations at any time. Finally, each

employee must agree that Lockheed may rescind or modify a previously approved accommodation "if circumstances change."

37.    Notably, the religious-exemption process does not recognize conscientious objections by individuals who do not subscribe to a religious order but who hold convictions comparable to religious belief.

38.    The medical exemption process is as burdensome as the religious exemption process. As part of the request process, Lockheed requires the employee to release medical information to Lockheed and to sign a consent form allowing Lockheed to disseminate medical information upon penalty of termination.

39.    Lockheed employs or recently employed all Plaintiffs. Plaintiffs have each submitted claims to the Texas Workforce Commission or Equal Employment Opportunity Commission complaining of discrimination against them for their refusal to accept experimental vaccinations. None of their claims have been adjudicated.

### III.   FACTUAL ALLEGATIONS

### A. Tamera Byrne

40.    Plaintiff Tamera Byrne was employed by Lockheed for over 20 years and held a Secret Clearance with the U.S. Federal Government. Her position required 10-15 years of experience. She was considered an "essential employee" in early 2020, and Lockheed required her to come to work in person each day. Ms. Byrne has had a COVID-19 infection, resulting in natural immunity. Under Lockheed's pressure to either receive a vaccine or be terminated, Ms. Byrne felt pressured to either suffer an

experimental medical treatment or leave Lockheed's employment, and retired on December 8, 2021, much earlier than she had planned.

**B. Gary Davis**

41.     Plaintiff Gary Davis is a tool maker at Lockheed's campus in Grand Prairie, Texas. Mr. Davis has religious and medical concerns that compel him to oppose submitting to a COVID-19 vaccine and wearing a face mask. Mr. Davis has had a COVID-19 infection, resulting in natural immunity that is superior to that conferred by any available vaccine. Mr. Davis requested religious and medical exemptions from Lockheed's masking and vaccine requirements. Lockheed denied the request for a mask exemption, and it has neither granted nor denied the request for a vaccine exemption. In August 2021, Lockheed placed Mr. Davis on an unpaid leave of absence and denied his application for short-term disability.

42.     Because Lockheed continuously claimed that it did not terminate Mr. Davis, Mr. Davis was unable to receive Texas unemployment benefits. Lockheed finally permitted Mr. Davis to return to work in March 2022, after seven months of unpaid leave of absence. Upon his return to work, Lockheed began making deductions from Mr. Davis's paychecks as reimbursement for medical coverage during the leave of absence. Throughout the exemption process, Lockheed required Mr. Davis to submit personal religious and medical information.

## IV.    CAUSE OF ACTION AND CLAIM – 42 U.S.C. § 1983

## A. Authorities

43.    42 U.S.C.S. § 1983 provides any person within the jurisdiction of the United States a civil cause of action for violations of constitutionally protected rights. To make claims under § 1983, the Plaintiff must plead, 1) a government actor 2) deprived a person of a constitutionally protected right, privilege, or immunity 3) under color of law. *See Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

i.    <u>Government Actors</u>

44.    As § 1983 makes clear, the only party liable in a civil suit for violation of constitutionally protected rights are government actors. The seminal case, *United States v. Stanley* in evaluating the alleged breaches of the Civil Rights Act of 1875, found that the Fourteenth Amendment Due Process clause applies to government actors only, not private entities. *United States v. Stanley*, 109 U.S. 3, 11-12 (1883). Multiple courts have re-affirmed the enduring vitality of this case's essential holdings. *United States v. Morrison*, 529 U.S. 598, 601 (2000).

45.    Since that holding, the Court has recognized two categories of exceptions to the state action requirement: public function and entanglement.

46.    The Court first recognized the public function exception to the state action requirement for constitutional violations in *Marsh v. Alabama*. There, the Court held that the Constitution still restricted a privately owned and operated town because it was executing a traditionally exclusively public function. *Marsh v. Alabama*, 326 U.S.

501, 505–07 (1945). Since then, the Court has jealously guarded the boundaries of this exception. *See, e.g., Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974).

47.    Three distinct exceptions make up the overall category of entanglement exceptions. They are the joint-action exception, the symbiosis exception, and the nexus exception.

48.    The joint-action exception applies when government and private actors explicitly act in concert toward the same purpose and that purpose is the basis of a plaintiff's complaint. The Supreme Court described the joint action theory as follows:

> Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.

*United States v. Price*, 383 U.S. 787, 794 (1966) (internal quotations omitted). The Court then applied the rule, finding that state officials working with private parties to release, intercept, assault, and kill prisoners summarily made the private parties into state actors for the purposes of the Fourteenth Amendment. *Id*. at 795.[5]

49.    The symbiosis exception applies when a government actor does not explicitly agree to a private party's conduct, but the government actor knows of the conduct, receives some benefit from the conduct, can stop the conduct, and chooses not to stop

---

[5] The Court has re-affirmed this exception several times, including *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970), *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 950, 102 S. Ct. 2744, 2760 (1982), and most recently in *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

the conduct. In *Burton v. Wilmington Parking Authority*, the Supreme Court described the symbiosis exception:

> By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its ***power, property and prestige*** behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (emphasis added). In applying this exception, the Court found that under the totality of the circumstances, a private café and a city through its public parking garage, which the café was using, had a sufficiently close relationship such that the Court could reasonably say that the government and private actors were joint participants in unconstitutional discrimination. *Id.* at 724–26.[6]

50.     The final exception, the nexus exception, is one which the Supreme Court of the United States has yet to address directly. However, the First Circuit Court of Appeals drew the nexus test out of several Supreme Court cases, writing,

> [W]hether there was an *elaborate financial or regulatory nexus* between appellants and the government of Puerto Rico which compelled appellants to act as they did . . . [there must be] a *sufficiently close nexus* between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

---

[6] This Court has repeatedly re-affirmed the essential holdings in *Burton. See, e.g., Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995); *see also, e.g., S.F. Arts & Ath., Inc. v. United States Olympic Comm.*, 483 U.S. 522, 546 (1987); *see also, e.g., Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 2786 (1982); *see also, e.g., Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172-73 (1972).

*Ponce v. Basketball Fed'n of P.R.*, 760 F.2d 375, 377 (1st Cir. 1985) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-1005; *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)) (cleaned up).

51.    Though Supreme Court cases support both the symbiosis exception and the nexus exception, the Fifth Circuit clearly states they are different tests. *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1223 (5th Cir. 1982). Because the same nucleus of law creates both exceptions, even the Fifth Circuit has questioned whether these tests are materially different tests "or simply different ways of characterizing [this] necessarily fact-bound inquiry." *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005), citing *Lugar*,  457 U.S. at 939.

52.    Fortunately, the Fifth Circuit uses equivalent analysis to the First Circuit, even citing the same Supreme Court precedent.

> Whether the acts of the appellees who served on the peer review committee as authorized by the Texas Medical Practice Act should be considered "state action" requires a nexus between those acts and the state such that appellees' conduct is "fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982). This nexus exists when the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." 457 U.S. at 840 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1003, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982)).

*Goss v. Mem'l Hosp. Sys.*, 789 F.2d 353, 356 (5th Cir. 1986); *cf.*, *Barrios-Velazquez v. Associcion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 492-93 (1st Cir. 1996) (analyzing and applying the nexus test in the same manner as the Fifth Circuit). Therefore, Plaintiffs urge this Court to explicitly adopt the language from the First Circuit to eliminate confusion.

ii.   <u>Distinguishing government actors from merely regulated actors.</u>

53.   To be clear, there is a significant difference between mere regulation as a cost of doing business in particular sectors and voluntarily seeking out regulation by making the federal government one's business. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 164 (1972).[7] The distinction flowing from this case is that an actor who is subject to regulation in its public business with private parties is categorically different in terms of constitutional protections from an entity actively seeking business from the federal government. In the first case, regulation is a hurdle to private business. In the second, regulation is part and parcel to the business.

iii.   <u>Distinguishing federal defense contractors from other private contractors.</u>

54.   As a general rule, private contractors do not become government actors merely by executing a government contract. *Rendell-Baker v. Kohn*, 457 U.S. 830, 840–41 (1982). Private contractors generally do not become government actors by executing government contracts because the relationship between the government and the contractor is nearly identical to the relationship between a contractor and a private entity. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 323 (1981). This is the vital distinction that appears repeatedly in the Supreme Court's reasoning regarding state actors [8]

---

[7] In *Moose Lodge*, the club, Moose Lodge, refused to serve a guest of a member who sued based on the Equal Protection Clause of the Fourteenth Amendment. *Id*. at 165. A three-judge panel in the district court found that Moose Lodge violated the equal protection clause because it was a government actor due to liquor regulation and had discriminated based on race. *Id*. at 165–66. The United States Supreme Court reversed, holding that mere regulation is not enough to make an institution into a government actor for constitutional purposes. *Id*. at 175–76, 179.

[8] See, *e.g.*, *Dodson*, 454 U.S. at 323 (holding that a public defender is not a state actor because the state does not change his relationship to his client compared to private attorneys.); *see also*, *e.g.*, *West v. Atkins*, 487 U.S. 42, 50–51, 54 (1988) (holding that a state-contracted doctor was a state actor because the state changed his relationship to the patient compared to private doctors.); *see also*, *e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1006–08 (1982) (holding that a nursing home is not a state actor because state

55.     For example, the Fifth Circuit held that a detention facility was a state actor under both the symbiosis and public function theories in former employees sued E-Systems, Inc. for violating their constitutional rights by searching their belongings and terminating their employment. *Dobyns v. E-Systems, Inc. Dobyns v. E-Sys., Inc.*, 667 F.2d 1219, 1221 (5th Cir. 1982). Regarding the symbiosis question, the Court's reasoning is laced with language about how the federal government substantially changed the nature of E-Systems's relationship compared to other private contractors. *Id*. at 1227–28. Concluding, the Fifth Circuit writes, "To find E-Systems to be merely a government contractor would forsake reality." *Id*. at 1228.

56.     To clarify, Plaintiffs do not contend that Lockheed's status as a mere employer or defense federal contractor makes it a state actor. Plaintiffs do contend that a contractor can be a state actor for some purposes and not for others, and such recognition is not examined in much of the case law.[9]

---

regulation did not change the nursing home's relationship to its residents compared to similarly situated professions.); *see also, e.g., Rendell-Baker v. Kohn*, 457 U.S. 830, 839–42 (1982) (holding that a private school is not a state actor because state funds and regulation did not change the school's relationship to its students compared to similarly situated professions).

[9] *Price v. Lockheed Martin Corp.* and *Gant v. Lockheed Martin Corp.* are not on point concerning the distinction between private contractors and defense contractors. There, the Fifth Circuit dismisses the appellants contention that Lockheed was a state actor in a three-sentence paragraph with no more analysis than a general case citation. *Price v. Lockheed Martin Corp.*, 261 Fed.Appx. 761, 764 (5th Cir. 2008). The Court's citation in *Price* was to another Fifth Circuit case where it held that the government's constitutional restrictions are less when it is performing the role of employer. *Price*, 261 Fed.Appx. at 764; *see also, U.S. v. Reyes*, 87 F.3d 676, 680 (5th Cir. 1996). This is inapplicable to the question of whether a federal defense contractor can qualify as a government actor because it does not evaluate any of the recognized exceptions. In *Gant v. Lockheed Martin Corp.*, the Fifth Circuit's dismissal of appellant's contention was two sentences and completely void of analysis. *Gant v. Lockheed Martin Corp.*, 152 Fed. Appx. 396, 397. The citation is to *Ballard v. Wall*, a case concerning whether private attorneys are state actors. *See Gant*, 152 Fed. Appx. at 397; *see also Ballard v. Wall*, 510, 518 (5th Cir. 2006). This case fails to provide the analysis necessary to decide whether a federal defense contractor is a state actor for constitutional purposes.

57.     Therefore, whether the general rule applies is fundamentally a question of whether the nature of contractor's role or relationships change because of the government. This could arise because of the contract terms, regulations, laws, incentives, or anything else that makes the contractor categorically different compared to other private contractors. Hence, if the specific terms and regulations of federal defense contracts makes the contractor different from other private contractors, the federal defense contractor is a government actor.

iv.     <u>Constitutionally Protected Right to Refuse Medical Treatment</u>

58.     Fundamental rights protected in the United States Constitution come in two varieties: enumerated and unenumerated. Primarily, the amendments to the Constitution protect enumerated rights. U.S. Const. amend. I *et seq*. Ever since *Gitlow v. New York*, the Supreme Court of the United States has recognized and protected fundamental rights from individual state infringement using the Fourteenth Amendment Due Process clause. *Gitlow v. New York*, 268 U.S. 652, 666 (1925). To date, the Court has not incorporated only three federally protected rights: the Third Amendment, the Seventh Amendment, and the Fifth Amendment right to grand jury indictment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884).

59.     Enumerated rights are not the only protected rights. The Court also protects certain unenumerated rights. In a long line of cases, the Court has held that:

> The Due Process Clause guarantees more than fair process, and the "liberty" it protects includes more than the absence of physical restraint. *Collins* v. *Harker Heights*, 503 U.S. 115, 125 (1992) (Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them'") (quoting *Daniels* v. *Williams*, 474 U.S. 327, 331 (1986)). The

Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. *Reno* v. *Flores*, 507 U.S. 292, 301-302 (1993); *Casey*, 505 U.S. at 851. In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving* v. *Virginia*, 388 U.S. 1 (1967); to have children, *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer* v. *Nebraska*, 262 U.S. 390 (1923); *Pierce* v. *Society of Sisters*, 268 U.S. 510 (1925); to marital privacy, *Griswold* v. *Connecticut*, 381 U.S. 479 (1965); to use contraception, *ibid*; *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972); to bodily integrity, *Rochin* v. *California*, 342 U.S. 165 (1952).

*Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) (emphasis added).

60.    The right to refuse medical treatment, is a fundamental right. U.S. Const. amend. V provides that "No person shall . . . be deprived of life, liberty or property without due process of law[.]" The Due Process Clause of the Fourteenth Amendment to the United States Constitution similarly provides that no state shall "deprive any person of life, liberty, or property, without due process of law [.]" U.S. Const. amend. XIV § 2. It is this liberty interest in the Fourteenth Amendment that protects those unenumerated rights so deeply "rooted in the traditions and conscience of our people as to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (overruled on other grounds).

61.    On multiple occasions, the United States Supreme Court has recognized the right of individuals to refuse violations of bodily autonomy. In *Washington v. Harper*, Washington state injected an inmate with an anti-psychotic drug against his will. *Washington v. Harper*, 494 U.S. 210, 216-17 (1990). Harper, the inmate, initiated a 42 U.S.C. § 1983 action against Washington for violating his Fourteenth Amendment

protected liberty interest. *Id*. at 217. The Supreme Court held, "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," but that the state policy met the constitutional scrutiny requirements. *Id*. at 229, 236.

62.     In *Cruzan v. Director, Mo. Dept. of Health*, the parents of a girl who was vegetative, directed the state hospital to remove her feeding tube and hydration equipment. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 266 (1990). The hospital refused based on an existing state law, leading the parents to file suit. *Id*. at 268. The Court assumed without holding that there is a right to refuse medical treatment. *Id*. at 273. Ultimately, the Court concluded the state was correct constitutionally and procedurally to deny the parent's directive. *Id*. at 285.

63.     In *Sell v. United States*, the United States Medical Center for Federal Prisoners in Springfield MO wanted to administer an anti-psychotic drug to a patient-prisoner, who a magistrate judge, on psychiatric recommendation, had sent to the facility for treatment before he could stand trial. *Sell v. United States*, 539 U.S. 166, 170–71 (2003). The magistrate judge hearing the request issued an order allowing the facility to administer anti-psychotic drugs to the patient-prisoner against his will. *Id*. at 173. The district court affirmed the magistrate judge's findings, despite finding the magistrate's findings of fact clearly erroneous. *Id*. at 173–74. The Eighth Circuit Court of Appeals affirmed the order as well, finding that there was no less-intrusive means for bringing the patient-prisoner to trial. *Id*. at 174–75. In reviewing the case, the United States Supreme Court's posture was that the right to refuse anti-psychotic

injections is a fundamental right and subsequently concluded that the government failed the applicable scrutiny standard. *Id*. at 179–81, 186.

64.     Importantly, the Court articulates the standard of scrutiny for this fundamental right as intermediate scrutiny; a standard usually applied in instances of discrimination based on a quasi-suspect classification. *Id*. at 179 (2003); *see also*, *cf.*, *Craig v. Boren*, 429 U.S. 190, 197–98 (1976).

65.     In *Sell*, the Court states that the government must prove the forcible injection was "necessary significantly to further important governmental trial-related interests." *Sell*, 539 U.S. at 179; *see also*, *cf.*, *Craig*, 429 U.S. at 197–96.

66.     Even the oft-cited Court's opinion in *Jacobson v. Massachusetts* included and imposed a concluding caveat:

> Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression.

*Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905) (emphasis added). Today's Supreme Court has cast doubt on *Jacobson*'s continued relevance.

67.     In *Roman Catholic Diocese v. Cuomo*, the Court held the state's severe and particular restrictions on religious services were constitutionally impermissible under relevant Free Exercise analysis. *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020).

68.     Justice Gorsuch concurred separately and cast doubt on continuing validity of

*Jacobson*. He wrote,

> Why have some mistaken this Court's modest decision in *Jacobson* for a
> towering authority that overshadows the Constitution during a
> pandemic? In the end, I can only surmise that much of the answer lies
> in a particular judicial impulse to stay out of the way in times of crisis.
> But if that impulse may be understandable or even admirable in other
> circumstances, we may not shelter in place when the Constitution is
> under attack. Things never go well when we do.

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 71 (2020) (Gorsuch, J.,

concurring) (emphasis added).

69.     Referring to *South Bay Pentecostal Church v. Newsom*, which had given much

leeway to the lockdown measures instituted by California's governor, Justice Gorsuch

wrote, "[T]hat opinion was mistaken from the start. To justify its result, the

concurrence reached back 100 years in the U. S. Reports to grab hold of our decision

in *Jacobson v. Massachusetts*, 197 U. S. 11 (1905). **But Jacobson hardly supports**

**cutting the Constitution loose during a pandemic.**" *Roman Catholic Diocese*,

141 S. Ct. at 70 (Gorsuch, J., Concurring) (emphasis added).

70.     In *Skinner v. Oklahoma*, the Supreme Court protected a prisoner from forced

sterilization, reversing the disastrous decision *Buck v. Bell*. *Skinner v. Oklahoma*,

316 U.S. 535, 541–43 (1942). Here the Court couches its due process analysis in the

right to be free from government interference in marriage and reproduction. *Id*. at

541. However, the procedural posture of this case more closely concerns refusing a

forced medical treatment. This is because the justification for the Court's conclusion

concerns first the irreversible effect of the medical procedure mandated. *Id*. The Court

writes, "There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury." *Id*. The Court states that this procedure deprives the defendant of his most basic right, procreation. *Id*. However, this only makes sense if it is first based on the right to refuse a medical procedure. According to the Court, the reason the deprivation of procreative abilities is impactful is because it is the state, not the individual, making the choice. *Id*. This reasoning much more closely supports the right to refuse medical treatment found in cases like *Cruzan*, *Harper*, and *Sell* because those are also cases where the state, not the individual, made choices concerning medical treatments.

71.    This Court has already recognized the right to bodily autonomy from invasive procedures without due process of law in other contexts. In *Birchfield v. North Dakota*, the Court heard three consolidated case concerning whether police officers had the authority to conduct blood tests for blood alcohol content without a warrant. *Birchfield v. North Dakota*, 579 U.S. 438, 453–54 (2016). Writing about the personal privacy and bodily autonomy interests of a suspect, the Court wrote, "Blood tests are a different matter. They "require piercing the skin" and extract a part of the subject's body." *Id*. at 463. The Court further wrote in a prior case, *Missouri v. McNeely*, that blood tests are "a compelled physical intrusion beneath [the defendant's] skin and into his veins." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (cleaned up).

72.    The majority concluded in *Birchfield* that blood draws were such a substantial invasion of a person's right to privacy based on bodily autonomy that Fourth Amendment required the police to obtain a warrant before conducting such a test.

*Birchfield*, 579 U.S. at 474. Although the Court's holding in *Birchfield* concerns the Fourth Amendment, the posture of the case still supports the fundamental right to refuse medical treatment because of bodily autonomy.

73.     Therefore, the right to refuse medical treatment falls well within the relevant jurisprudence on the protected rights. U.S. Const. amend. I *et seq.* enumerate negative rights. Excellent examples are the First and Fourth Amendments. The First Amendment guarantees the rights to be free from government interference in speech, press, gatherings, and religious practice. U.S. Const. amend. I. The Fourth Amendment guarantees protections from unreasonable search and seizure. U.S. Const. amend. IV. As explored in ¶ 50, the Supreme Court's jurisprudence on unenumerated rights follows the model of the constitutional amendments. Nearly all of the unenumerated rights the Court has recognized as deeply rooted in the history, traditions, and conscience of America and its peoples are negative rights. *See Glucksberg*, 521 U.S. at 719-20. Examples include the right to be free from government interference in parental decisions on education and the right to be free from government interference in marriage. *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972); *see also Loving v. Virginia*, 388 U.S. 1, 12 (1967). Hence, the negative right to refuse medical treatment is a fundamental right the U.S. Constitution protects via the Due Process clause.

   v.     <u>Color of Law</u>

74.     The Supreme Court held in *U.S. v. Price* that the color-of-law element of § 1983 claims is equivalent to the state-action requirement for the Fourteenth Amendment.

*Price*, 383 U.S. at 794, n.7. The Court affirmed this holding in *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). Therefore, for clarity, Plaintiffs' state-action analysis and color-of-law analysis will be the same.

vi.  Remedies

75.  Damages for a § 1983 claim are available in the traditional, common-law tort forms of compensatory or nominal damages, punitive damages, and attorneys' fees. *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *see also* 28 U.S.C.S. § 1988 (b) (LEXIS).

76.  This Court has the authority to grant declaratory relief as a remedy under 28 U.S.C.S. § 2201 (LEXIS) because this action is not one regarding federal taxes, bankruptcy, or international trade.

**B.  Claim: Lockheed Martin violated 42 U.S.C § 1983.**

77.  Defendant, Lockheed Martin violated 42 U.S.C. § 1983 by mandating COVID-19 vaccines because Lockheed is a government actor depriving the Lockheed Plaintiffs of their constitutional right to refuse medical treatment under color of law.

i.  Lockheed qualifies as a government actor.

78.  Defendant Lockheed Martin qualifies as a government actor for the purpose of constitutional protections. Lockheed is a state actor under both the symbiosis exception and the nexus exception.

ii.  Lockheed acts in symbiotic relationship with the federal government for the purpose of enforcing mandatory vaccines.

79.  While Defendant Lockheed is a private company, it is nonetheless acting at the behest of and as agent of the Department of Defense and other governmental agencies.

80.    Lockheed originally introduced its vaccine policy in response to EO 14042. Even though the Supreme Court stayed the order the order, Lockheed has continued the mandatory vaccination policy. *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661, 666-67 (2022). Despite what it might state generally to its employees with trite quips about safety, the true consideration for continuing the policy relates to Lockheed's interest in working lockstep with the federal government.

81.    As a federal military contractor, Lockheed must compete for federal defense contracts. Additionally, Lockheed must adhere to the federal contactor guidelines to be eligible for consideration. Without adhering strictly to the federal guidelines, Lockheed risks jeopardizing future military contracts which make up a staggering portion of its annual revenue. Therefore, Lockheed must work with the federal government towards the government's ends to protect its interests. Exhibit 3, Lockheed Martin 2021 Annual Report, p. 11–12.

82.    Plaintiffs believe that discovery will show contracts between the federal government and Lockheed, further reinforcing their status as state actors.

83.    Even if the EO 14042 is no longer binding on contractors, the White House's SFWTF's guidance still acts as the guidepost for federal contractors who wish to continue obtaining contracts. In keeping the vaccine mandate, Lockheed, therefore, protects its interest in obtaining further contracts. In doing so, Lockheed makes itself a government actor by working toward the same end as the federal government, to the benefit of the federal government. Therefore, Lockheed must respect federal constitutional boundaries.

iii.   <u>Lockheed has such a nexus of financial and regulatory connections with the federal government that it can rightly be considered a government actor.</u>

84.   Like all employers, Lockheed must abide by certain regulatory guidelines. However, certain regulations make Lockheed unique in the degree it is tied up with the U.S. federal government.

85.   Federal contractors must adhere to the Federal Acquisition Regulations ("FAR") to qualify for federal contracts. If a company fails to meet these guidelines, it will not be eligible for federal contracts. FAR controls not only eligibility but also the nature of the contract itself. It regulates everything from specific clauses to the conditions on which the federal government may change or terminate the contract. In total, the FAR is more than 1900 pages.

86.   Further, contractors who wish to do business with certain agencies must adhere to that agency's addendum to the FAR. For the Department of Defense (DoD), federal contractors are responsible for complying with the Defense Federal Acquisitions Regulations ("DFARS"). This 1300 plus page document clarifies and carefully defines many aspects of a federal defense contracts.

87.   The Defense Contract Audit Agency ("DCAA") and the Defense Contract Management Agency ("DCMA") both routinely audit Lockheed and other federal defense contractors for compliance. Failing these reviews can result in disastrous consequences for Lockheed's business structure as it could lose contracts and profits.

88.   Additionally, federal contractors dealing in certain military products are subject to the Export Administration Regulations ("EAR"). The Bureau of Industry

and Security provided a helpful summary in the Code of Federal Regulations to explain the basics of compliance with EAR. Exhibit 5, Supp. No. 2 to Part 732.

89.     In each annual report, Lockheed must report various risk factors that could cause the stock to lose value. The very first item is Lockheed's dependence of the federal government. In a section concerning the risks of procurement laws and regulations, Lockheed distinguishes how its business with the federal government is categorically different than commercial transactions. An examples Lockheed provides is that the U.S. Government may terminate contracts for convenience. Additionally, the federal government may unilaterally definitize contracts, something that does not occur with commercial transactions. Exhibit 3, Lockheed Martin 2021 Annual Report, p. 11–12.

90.     Further, the federal government may impost severe restrictions on Lockheed's ability to use its intellectual property. Both the FAR and DFARS provide that the federal government may obtain Lockheed's rights to certain intellectual property, including patents. This sort of interference is particularly unique to executing federal acquisition and development contracts, particularly when the Department of Defense is the largest actor in acquiring property from Lockheed. Exhibit 3, Lockheed Martin 2021 Annual Report, p. 19.

91.     Not only is Lockheed heavily tied to the federal government by regulation, but there is also a substantial financial tie between Lockheed Martin and the federal government. According to Lockheed's public stockholder report on its financial situation, fully 71% of its $67 billion in net sales in fiscal year 2021 came from the

U.S. government. 62% of that amount came from the Department of Defense alone. Exhibit 3, Lockheed Martin 2021 Annual Report at p. 3.

92.    Lockheed's contracts with the federal government amounted to almost 2.7 times the contracted amount as the next closest federal defense contractor. In its public stockholder report, Lockheed lauds its close ties with the federal government, especially its F-35, C-130, F-16, and F-22 aircraft projects. According to the report, 27% of Lockheed's net sales came from its F-35 program with the U.S. Airforce. Exhibit 3, Lockheed Martin 2021 Annual Report at pgs. 3–4.

93.    As if this were not close enough ties, Lockheed announced it was partnering contractually with the U.S. government on several classified programs. Exhibit 3, Lockheed Martin 2021 Annual Report at p. 4.

94.    Since fiscal year 2011, no less than 69% of Lockheed's net sales came from contracts with the U.S. government. Between Fiscal Year 2011 and Fiscal Year 2021, Lockheed's net sales from contracts the U.S. federal government have increased by $9.4 billion.

95.    A Department of Defense Report from February 2022 showed that in seven out of ten major weapons categories, Lockheed was one of the top suppliers. In each category, there were no more than four suppliers in the market. Exhibit 4, DoD Report on the Defense Industrial Base at p. 5, Table 1.

96.    Without the U.S. federal government, there would be no Lockheed Martin, at least to the extent it exists now. It is reasonable to say that the degree of connection

between the two, both through regulatorily and financially, renders Lockheed a government actor under the nexus exception to the government actor requirement.

iv.   <u>Lockheed violated Plaintiffs' constitutionally protected rights.</u>

97.   As explored in the facts, which Plaintiffs herein incorporate in full by reference, Lockheed mandated its employees to become vaccinated to COVID-19 with only two exceptions, neither of which could be reasonably satisfied, and subject to continuous review.

98.   Mandating one's employees to obtain a vaccine violates the fundamental right to refuse medical treatment. The COVID-19 vaccine is just as invasive as the anti-psychosis injections and blood draws the Supreme Court has already recognized are violations of the fundamental right. They are just as invasive because they are compelled injections against the individual's will. Therefore, Lockheed violated the Lockheed Plaintiffs' constitutional rights, subjecting Lockheed to damages.

v.   <u>Lockheed violated Plaintiffs' rights under color of law.</u>

99.   As explored above in ¶¶ 84-98, Lockheed acted under color of law by nature of being a state actor through the symbiosis and nexus exceptions.

### V.   CAUSE OF ACTION AND CLAIM – 42 U.S.C. 12112(d)(4)(A)

**A. Authorities**

100.   The Americans with Disabilities Act, specifically 42 U.S.C. 12112(d)(4)(A), provides that an employer may not require a medical examination of or disability inquiry into an employee unless such steps are job-related and consistent with business necessity.

101.   29 CFR 1630.14 (c) provides that a covered entity, i.e., an employer with more than fifteen employees, may require a medical examination or make an inquiry of an employee if it is job-related and consistent with business necessity.

102.   An employee need not be disabled to raise a claim under 42 U.S.C. 12112 (d). *Taylor v. City of Shreveport*, 798 F.3d 276, 284 (5th Cir. 2015). The plaintiff-employee must show that the violation resulted in some sort of tangible injury. *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 561 (5th Cir. 1998). Finally, the plaintiff-employee must show the causal link between the violation and the damages he seeks. *Buchanan v. City of San Antonio*, 85 F.3d 196, 200 (5th Cir. 1996).

**B. Claim: Lockheed Martin violated 42 U.S.C. § 12112(d)(4)(A).**

103.   Lockheed Martin violated § 12112(d)(4)(A) by impermissibly requiring its employees to report medical history other than what was job-related and consistent with business necessity. In its policy, Lockheed required its employees to report whether they had obtained a COVID-19 vaccine.

104.   Additionally, if the employee requested an accommodation to the mandatory vaccine policy, Lockheed required that employee to show why he needed that accommodation with specific medical reports.

105.   Lockheed bears the burden of showing why these reporting requirements are job-related and consistent with business necessity. *Taylor v. City of Shreveport*, 798 F.3d 276, 286–87 (5th Cir. 2015).

106. Lockheed's policy caused Plaintiffs' damages. But for Lockheed asking after Plaintiffs' vaccination status and medical records, Lockheed would not have suspended either Plaintiff.

107. Additionally, it was foreseeable to the ordinary reasonable person that if Lockheed asked after its employee's vaccination status and medical records, it would statistically discover some of those employees were not vaccinated for COVID-19. Then, Lockheed would foreseeably know it would need to act on that knowledge. Since Lockheed had stated that suspension was a likely consequence of failing to get the COVID-19 vaccine, it would foreseeably know that it would suspend some of the employees it discovered had not been vaccinated. Therefore, Lockheed's policy violated Plaintiffs' rights under § 12112(d)(4)(A), entitling Plaintiffs to damages.

## VI.   REQUEST FOR RELIEF

### A. DAMAGES

108. The Lockheed Plaintiffs pray this Court award damages as follows.

i.   <u>Compensatory Damages</u>

109. Plaintiff Gary Davis prays this Court award him $40,880.23 in lost wages with applicable pre- and post-judgment interest as allowed by law.

110. Plaintiff Tamera Byrne prays this Court award her $1,013,316.60 in lost wages, $129,647.30 in lost savings, amounting to a total of $1,142,963.90. Plaintiff Byrne prays this court award pre- and post-judgment interest as allowed at law.

ii.   <u>In the alternative – Nominal Damages</u>

111.   If the Lockheed Plaintiffs are unable to recover compensatory damages, they

pray in the alternative that this court award each $1.00 in nominal damages.

iii.   <u>Attorneys' Fees</u>

112.   The Lockheed Plaintiffs pray this court award attorney's fees as allowed at law.

## B.  DECLARATORY JUDGMENT

113.   All Plaintiffs request that this Court make the following declarations: a) EO

14042 is invalid as to requiring compulsory vaccinations of American Citizens; and b)

the right to refuse medical treatment is a fundamental right deserving strict scrutiny

or in the alternative, intermediate scrutiny.

## VII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, the Lockheed Plaintiffs pray this

Court award economic damages, attorney's fees, and declaratory relief, against the

Lockheed Martin Corp. as well as all other remedies allowed them by law.

Respectfully submitted,

NORRED LAW, PLLC
By: <u>*/s/ Warren V. Norred*</u>
Warren V. Norred, TX Bar No. 24045094
wnorred@norredlaw.com
515 E. Border St.; Arlington, Texas 76010
P: (817) 704-3984
*Attorney for Plaintiffs*

**ATTACHMENTS:**
Exhibit 1 – Lockheed Employee Email Concerning Vaccination
Exhibit 2 – Corporate Communication
Exhibit 3 – Lockheed Martin 2021 Annual Report
Exhibit 4 – DoD Report on the Defense Industrial Base
Exhibit 5 – Supp. No. 2, Part 732